**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

*Attorney for Plaintiff*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DYLAN CARAKER, Individually and On Behalf of All Others Similarly Situated, | **Civil Action No.** |
| *Plaintiff,* | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| OCULAR THERAPEUTIX, INC., AMARPREET SAWHNEY, GEORGE MIGAUSKY, ANDREW HURLEY, and ERIC ANKERUD, | <u>**DEMAND FOR JURY TRIAL**</u> |
| *Defendants.* | |

Plaintiff Dylan Caraker ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ocular Therapeutix, Inc. ("Ocular" or the "Company"), analysts' reports and advisories about the

Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class, defined in paragraph 29 below, of who purchased or otherwise acquired Ocular securities between May 5, 2017 through July 6, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Ocular, a biopharmaceutical company, focuses on the development and commercialization of therapies for diseases and conditions of the eye using its proprietary hydrogel platform technology in the United States. The Company's lead product is DEXTENZA, which is in Phase III clinical trial for the treatment of post-surgical pain and inflammation, allergic conjunctivitis; and in Phase II clinical trial for the treatment of inflammatory dry eye disease.

3.     Ocular was founded in 2006 and is headquartered in Bedford, Massachusetts.  The Company's stock trades on the NASDAQ stock exchange ("NASDAQ") under the ticker symbol "OCUL."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocular was experiencing significant manufacturing issues with respect to DEXTENZA, including that more

than 50% of lots manufactured by Ocular Therapeutix contained bad product; (ii) such manufacturing issues could imperil DEXTENZA's approval by the FDA; and (iii) as a result of the foregoing, Ocular's public statements were materially false and misleading at all relevant times.

5.     On July 6, 2017, shortly before the end of the trading day, the website *Seeking Alpha* published an article entitled "Ocular: A Poke In The Eye", reporting, in part, that the Company's management had misled Ocular investors regarding ongoing manufacturing issues and downplayed the significance of U.S. Food and Drug Administration ("FDA") communications regarding these issues.  The article stated, in relevant part:

**Dextenza Manufacturing Issues**

OCUL has disclosed that they received a second 483 from the FDA after their facility re-inspection. Even a layperson reading this can tell that the company is having serious manufacturing issues, and their whole approach to manufacturing and patient safety is highly questionable. What's more troubling is that either management doesn't fully understand the letter, or they have been misleading investors. Both are bad.

On their last earnings call, management made a number of statements regarding the 483 and the company's manufacturing process:

> *"We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues."* Ocular Therapeutix's CEO Amar Sawhney on Q1 2017 Results - Earnings Call Transcript.

> *"So I think that's a strong sign that the manufacturing process has moved forward significantly, and is in a fully developed mode."*

The CEO concluded:

> *"Also remembering that this is a new investigator, different one that came last time. So when you have a different one coming, they confirm what the prior one did, and then they probably have some additional helpful suggestions."*

Now, let's look at reality:

**First**, OCUL has REPEAT observations. Not only did they not resolve prior issues, but have committed worse transgressions. Here is a copy of the first 483.

**Observation 6** reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*"

**Observation 5** of the second 483 reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*" Sounds familiar?

**Observation 3** of the second 483 reads: "*There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess. Specifically, your firm lacks documentation to show that your product can consistently meet specifications as you have not systemically evaluated the [redacted] lots manufactured from FEB2016 to present, of which [redacted] failed specification and were disposed of in-process.*"

In plain English, this means, OCUL still doesn't know to make their product consistently. How does OCUL deal with instances when product doesn't meet specifications? They have been **discarding bad manufacturing lots** without investigation.

**Second,** OCUL has characterized their manufacturing as "*in a fully developed mode.*" Well, **Observation 1** of the second 483 reads: "*Particulate matter has been noted in 10/23 lots (intended use clinical, R&D, stability, etc.) manufactured from FEB2016 to date. The remaining [redacted] lots were scrapped prior to the visual inspection therefore their particulate status remains unknown.*"

In plain English, this means that more than 50% of lots manufactured by OCUL contain bad product. That leaves plenty of room for additional development. Sometimes, OCUL has had to discard entire lots because they were out of spec!!

**Third**, if OCUL only discarded bad product without investigation, that would be a bad thing. But in fact, they have been using bad product in clinical trials and have released some into their commercial supply!

**Observation 1** continues: "*Particulates were not logged as product defects prior to FEB2016, therefore lots released prior to that date, such as clinical trial lots [redacted], released [redacted]respectively and used in human clinical trials are unknown with respect to particulate status.*"

**Observation 2** reads: "*The following batches were released without an understanding of the defects present, more specifically, particulate matter of unknown origin and composition at the time of release: ...all three lots were released for intended commercial use on 12JAN2017 without critical defect limits.*"

OCUL believes that their manufacturing is "fully developed" and remaining issues can be resolved quickly. The reality is, IF Dextenza is possible to manufacture on a mass scale, something which hasn't been done before, OCUL needs to revamp their entire process from the ground up, which can take years to do. They need to use the proper scientific tools and procedures. (**Observation 5** of the second 483 says that the scales OCUL has been using aren't sensitive enough to weigh the "full range of materials")

**Fourth**, calling 483 observations "helpful suggestions," reflects a lack of understanding of the FDA compliance function. I have a lot of respect for OCUL's now-former CEO. He is a brilliant person and a highly successful entrepreneur. However, the pharmaceutical world is not his, and he finally recognized that he is not the right person to develop the company further.

(Emphasis in original.)

6.      On that same day, STAT published an article on the Company asserting that DEXTENZA could be rejected by the FDA because of product contamination, including aluminum, found by an FDA inspector during a visit to the company's manufacturing facility.

7.      On this news, Ocular's share price fell $3.06 or over 30% over two trading days, to close at $7.12 on July 7, 2017.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). The Company conducts business and a significant portion of Defendants' actions and subsequent damages took place within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff is a citizen of Marion County, Indiana.  Plaintiff, as set forth in the attached Certification, acquired Ocular securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Ocular is incorporated in Delaware, with principal executive offices located at 34 Crosby Drive, Suite 105, Bedford, Massachusetts 01730.  The Company is registered to do business in New Jersey.  Ocular's shares trade on the NASDAQ under the ticker symbol "OCUL."

15.     Defendant Amarpreet Sawhney ("Sawhney") has served at all relevant times as the Company's Chief Executive Officer ("CEO"), Chairman, and President.

16.     Defendant George V. Migausky ("Migausky") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

17.     Defendant Andrew Hurley ("Hurley") has served at all relevant times as the Company's Chief Commercial Officer.

6

18.    The defendants referenced above in ¶¶ 15-17 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.    Ocular, a biopharmaceutical company, focuses on the development and commercialization of therapies for diseases and conditions of the eye using its proprietary hydrogel platform technology in the United States. The Company's lead product is DEXTENZA, which is in Phase III clinical trial for the treatment of post-surgical pain and inflammation, allergic conjunctivitis; and in Phase II clinical trial for the treatment of inflammatory dry eye disease.

20.    Form FDA 483 is a form used by the FDA to document and communicate concerns discovered during inspection.

### Materially False and Misleading Statements Issued During the Class Period

21.    The Class Period begins on May 5, 2017, when Ocular issued a Current Report, filed on Form 8-K with the SEC, entitled "Ocular Therapeutix Reports First Quarter 2017 Financial Results," disclosing that it had received a Form 483 related to its lead product DEXTENZA, stating in relevant part:

> BEDFORD, Mass.--(BUSINESS WIRE)--May 5, 2017-- Ocular Therapeutix, Inc. (NASDAQ: OCUL), a biopharmaceutical company focused on the development, manufacturing and commercialization of innovative therapies for diseases and conditions of the eye, today announced financial results for the first quarter ended March 31, 2017.
>
> "This is an important time for Ocular Therapeutix as we approach the PDUFA target action date for our lead product candidate, DEXTENZA, for the treatment of ocular pain following ophthalmic surgery," said Amar Sawhney, Ph.D., President, Chief Executive Officer and Chairman. "Should DEXTENZA be approved, its commercial launch will enable our transition into a fully-integrated, commercial-stage, revenue-generating company. DEXTENZA has now been extensively studied for the treatment of post-surgical ocular pain and

inflammation in over 550 clinical trial participants. If approved, we believe DEXTENZA will address the compliance issues associated with steroid eye drops and serve as an attractive alternative for both patients and ophthalmologists."

## Recent Highlights and Anticipated Near-Term Milestones for Key Development Programs

### DEXTENZA™

- A New Drug Application (NDA) for DEXTENZA (dexamethasone insert) 0.4mg for intracanalicular use is currently under review by the U.S. Food and Drug Administration (FDA) for the treatment of ocular pain following ophthalmic surgery. The FDA has set a target action date under the Prescription Drug User Fee Act (PDUFA) of July 19, 2017 for a decision regarding the potential approval of DEXTENZA. ***Following a re-inspection of manufacturing operations by the FDA which was completed earlier this week, Ocular Therapeutix received an FDA Form 483 containing inspectional observations focused on procedures for manufacturing processes and analytical testing, related to manufacture of drug product for commercial production.*** The Company plans to evaluate and respond to the FDA within 15 days with corrective action plans to complete the inspection process. Adequate resolution of the outstanding Form 483 inspectional observations is a prerequisite to the approval of the NDA for DEXTENZA.

    - Subject to the approval of the NDA for post-surgical ocular pain by the FDA, Ocular Therapeutix intends to submit an NDA supplement for DEXTENZA to broaden its label to include an indication for post-surgical ocular inflammation.

- Ocular Therapeutix plans to present additional data from its most recent Phase 3 study evaluating the efficacy and safety of DEXTENZA for the treatment of ocular pain and inflammation following cataract surgery, at the upcoming American Society of Cataract and Refractive Surgery (ASCRS) Annual Meeting, being held today through Tuesday, May 9, in Los Angeles, CA.

    - Additional presentations will be made at the meeting regarding recent positive results of a patient experience study of DEXTENZA as well as the importance of the assessment of ocular pain.

- In addition, DEXTENZA is in Phase 3 clinical development for the treatment of allergic conjunctivitis. In May 2017, the Company initiated a non-significant risk device study to confirm the effect on efficacy of the placebo insert used in previous studies compared with a rapidly resorbing placebo insert.

- Subject to favorable results from this study, the Company plans to conduct an additional Phase 3 clinical trial to further evaluate DEXTENZA for the treatment of allergic conjunctivitis.

22.    On that same day, the Company held an earnings conference call with investors, during which Defendant Ankerud stated the following regarding Form 483:

Eric Ankerud

Good morning, Ken. Thanks for the question. ***FDA completed the re-inspection of our facility as part of the NDA review late yesterday afternoon. As Amar mentioned, 43 was issued.*** We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues. This was a new investigator not the same investigator from prior inspections, and their primary focus in the 43 relates to a particular matter issue as part of our manufacturing process. The issue relates primarily to completion of an investigation that we have underway in regard to the particular matter solidifying specifications for in process, 100% visual inspection of our inserts, as well as enhancing our operator training. ***We feel quite comfortable that we have the situation under control and we are preparing responses to the 43 as of this morning in anticipation of responding within 15 calendar days to the agency.*** In addition to the particular matter issue, FDA raised a couple of observations in regard to analytical method, testing to be completed, as well as some other issue related to quality oversight of batch records. So in summary, we believe that each of the observations raised by FDA during this continuous improvement review of our fully developed manufacturing process are handled well and will be resolved in our response to FDA. We're also pleased that the collaborative nature of our NDA review has continued between the various offices of FDA, and we're marching toward that PDUFA date and ***expect that we can resolve the 43 issues in a timely manner.***

(Emphasis added.)

23.    On the same earnings call, Defendant Sawhney discussed with analysts Form 483, stating in relevant part:

Andrew Berens

Okay. Is there anything in their observations that you think could delay the action date specifically?

Amar Sawhney

9

Nothing that we can currently see. I think these -- as you know, probably 90% plus inspections have 483. ***The question is one of the nature of the issues in the 483, we think these are resolvable issues, and we have responses.*** Some already prepared and some being prepared to address them in a timely fashion.

(Emphasis added).

24.     The statements referenced in ¶¶ 21-23 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocular was experiencing significant manufacturing issues with respect to DEXTENZA, including that more than 50% of lots manufactured by Ocular Therapeutix contained bad product; (ii) such manufacturing issues could imperil DEXTENZA's approval by the FDA; and (iii) as a result of the foregoing, Ocular's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

25.     On July 6, 2017, shortly before the end of the trading day, the website *Seeking Alpha* published an article entitled "Ocular: A Poke In The Eye", reporting, in part, that the Company's management had misled Ocular investors regarding ongoing manufacturing issues and downplayed the significance of FDA communications regarding these issues.  The article stated, in relevant part:

**Dextenza Manufacturing Issues**

OCUL has disclosed that they received a second 483 from the FDA after their facility re-inspection. Even a layperson reading this can tell that the company is having serious manufacturing issues, and their whole approach to manufacturing and patient safety is highly questionable. What's more troubling is that either management doesn't fully understand the letter, or they have been misleading investors. Both are bad.

On their last earnings call, management made a number of statements regarding the 483 and the company's manufacturing process:

> *"We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues."* Ocular Therapeutix's CEO Amar Sawhney on Q1 2017 Results - Earnings Call Transcript.

> *"So I think that's a strong sign that the manufacturing process has moved forward significantly, and is in a fully developed mode."*

The CEO concluded:

> "*Also remembering that this is a new investigator, different one that came last time. So when you have a different one coming, they confirm what the prior one did, and then they probably have some additional helpful suggestions.*"

Now, let's look at reality:

**First**, OCUL has REPEAT observations. Not only did they not resolve prior issues, but have committed worse transgressions. Here is a copy of the first 483.

**Observation 6** reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*"

**Observation 5** of the second 483 reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*" Sounds familiar?

**Observation 3** of the second 483 reads: "*There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess. Specifically, your firm lacks documentation to show that your product can consistently meet specifications as you have not systemically evaluated the [redacted] lots manufactured from FEB2016 to present, of which [redacted] failed specification and were disposed of in-process.*"

In plain English, this means, OCUL still doesn't know to make their product consistently. How does OCUL deal with instances when product doesn't meet specifications? They have been **discarding bad manufacturing lots** without investigation.

**Second,** OCUL has characterized their manufacturing as "*in a fully developed mode.*" Well, **Observation 1** of the second 483 reads: "*Particulate matter has been noted in 10/23 lots (intended use clinical, R&D, stability, etc.) manufactured from FEB2016 to date. The remaining [redacted] lots were scrapped prior to the visual inspection therefore their particulate status remains unknown.*"

In plain English, this means that more than 50% of lots manufactured by OCUL contain bad product. That leaves plenty of room for additional development. Sometimes, OCUL has had to discard entire lots because they were out of spec!!

**Third,** if OCUL only discarded bad product without investigation, that would be a bad thing. But in fact, they have been using bad product in clinical trials and have released some into their commercial supply!

**Observation 1** continues: "*Particulates were not logged as product defects prior to FEB2016, therefore lots released prior to that date, such as clinical trial lots [redacted], released [redacted]respectively and used in human clinical trials are unknown with respect to particulate status.*"

**Observation 2** reads: "*The following batches were released without an understanding of the defects present, more specifically, particulate matter of unknown origin and composition at the time of release: ...all three lots were released for intended commercial use on 12JAN2017 without critical defect limits.*"

OCUL believes that their manufacturing is "fully developed" and remaining issues can be resolved quickly. The reality is, IF Dextenza is possible to manufacture on a mass scale, something which hasn't been done before, OCUL needs to revamp their entire process from the ground up, which can take years to do. They need to use the proper scientific tools and procedures. (**Observation 5** of the second 483 says that the scales OCUL has been using aren't sensitive enough to weigh the "full range of materials")

**Fourth,** calling 483 observations "helpful suggestions," reflects a lack of understanding of the FDA compliance function. I have a lot of respect for OCUL's now-former CEO. He is a brilliant person and a highly successful entrepreneur. However, the pharmaceutical world is not his, and he finally recognized that he is not the right person to develop the company further.

(Emphasis in original.)

26.     On that same day, STAT published an article on the Company asserting that DEXTENZA could be rejected by the FDA because of product contamination, including aluminum, found by an FDA inspector during a visit to the company's manufacturing facility.

27.     On this news, Ocular's share price fell $3.06 or over 30% over two trading days, to close at $7.12 on July 7, 2017.

28.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ocular securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, and any judicial officers who handle this matter, and their immediate families.

30.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ocular securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can be ascertained only through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Ocular or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ocular;

- whether the Individual Defendants caused Ocular to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ocular securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ocular securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ocular securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

36. Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants)**

38.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ocular securities; and (iii) cause plaintiff and other members of the Class to purchase or otherwise acquire Ocular securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

41.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Ocular securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ocular's finances and business prospects.

42.    By virtue of their positions at Ocular, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

43.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Ocular, the Individual Defendants had knowledge of the details of Ocular's internal affairs.

44.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ocular.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ocular's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Ocular securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ocular's business and financial condition which were concealed by defendants, plaintiff and the other members of the Class purchased or otherwise acquired Ocular securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

45.    During the Class Period, Ocular securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ocular securities at prices artificially inflated by defendants' wrongful conduct. Had plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by plaintiff and the Class, the true value of Ocular securities was substantially lower than the prices paid by plaintiff and the other members of the Class. The market price of Ocular securities declined sharply upon public disclosure of the facts alleged herein to the injury of plaintiff and Class members.

46.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

48.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49.    During the Class Period, the Individual Defendants participated in the operation and management of Ocular, and conducted and participated, directly and indirectly, in the conduct of Ocular's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ocular's misstatement of income and expenses and false financial statements.

50.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ocular's financial condition and results of operations, and to correct promptly any public statements issued by Ocular which had become materially false or misleading.

51.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ocular disseminated in the marketplace during the Class Period concerning Ocular's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ocular to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ocular within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ocular securities.

52.    Each of the Individual Defendants, therefore, acted as a controlling person of Ocular.  By reason of their senior management positions and/or being directors of Ocular, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ocular to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ocular and possessed the power to control the specific activities which comprise the primary violations about which plaintiff and the other members of the Class complain.

53.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ocular.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.


**LITE DEPALMA GREENBERG, LLC**

Dated: July 12, 2017

*/s/Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil action:

- *Gallagher v. Ocular Therapeutix, Inc.*, *et al.*,
  Docket No. 2:17-cv-05011 (D.N.J. Jul 07, 2017)

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG, LLC**

Dated: July 12, 2017                    */s/Bruce D. Greenberg*
                                          Bruce D. Greenberg
                                          570 Broad Street, Suite 1201
                                          Newark, New Jersey 07102
                                          Telephone: (973) 623-3000
                                          Facsimile: (973) 623-0858
                                          Email: bgreenberg@litedepalma.com

                                          **POMERANTZ LLP**
                                          Jeremy A. Lieberman
                                          J. Alexander Hood II
                                          Hui M. Chang
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Telephone:  (212) 661-1100
                                          Facsimile:  (212) 661-8665
                                          Email:  jalieberman@pomlaw.com
                                                ahood@pomlaw.com
                                                hchang@pomlaw.com

                                          **POMERANTZ LLP**
                                          Patrick V. Dahlstrom
                                          10 South La Salle Street, Suite 3505
                                          Chicago, Illinois 60603
                                          Telephone:  (312) 377-1181
                                          Facsimile:  (312) 377-1184
                                          Email:  pdahlstrom@pomlaw.com

                                          *Attorneys for Plaintiff*

**OCULAR THERAPEUTIX, INC. (OCUL)**                                    **Caraker, Dylan**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 6/23/2017 | Purchase | 16 | $10.2299 |
| 6/24/2017 | Purchase | 2 | $10.0037 |
| 6/24/2017 | Purchase | 15 | $10.3500 |
| 6/26/2017 | Sale | 16 | $10.5100 |

**Submission Date**

2017-07-07 12:17:36

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995. 2.  I have reviewed a Complaint against against Ocular Therapeutix, Inc. ("Ocular" or the "Company") and, authorize the filing of a comparable complaint on my behalf. 3.   I did not purchase or acquire Ocular securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act. 4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Ocular securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action. 5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Ocular  securities during the Class Period as specified in the Complaint. 6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws. 7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court. 8.    I declare under penalty of perjury that the foregoing is true and correct.

Name

**Print Name**

Dylan Caraker



(see attached)

Documents & Message

**Signature**



**Full Name**

Dylan Caraker

